AO 91 (rev.11/11) Criminal Complaint

AUTHORIZED AND APPROVED DATE: _____ 5/13/22

# United States District Court
### for the

_____ WE.STERN _____ DISTRICT OF _____ OKI.AHOMA _____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>-vs-<br><br>VICTORIANO NERI HERNANDEZ,<br>ANTONIO ORTIZ HERRERA,<br>SAMPSON EDGARDO CHAVEZ,<br>  a/k/a Osito,<br>CESAR CECILIO PEREZ RUBIO,<br>JUAN CITLACIC DE LUNA,<br>  a/k/a Poste,<br>IVAN CHANAX AGUILAR,<br>RUBY JACKSON, and<br>FNU LNU (UM6086),<br>  a/k/a Pelon,<br><br>       Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. M-22-349     -STE |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. From in or about September, 2021, and continuing thereafter until on or about May 12, 2022, in the Western District of Oklahoma, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to Possess with Intent to Distribute and to Distribute 500 Grams or more of Methamphetamine and 5 kilograms or more of Cocaine. |

This criminal complaint is based on these facts: See attached Affidavit of Special Agent Marc Jones with the Federal Bureau of Investigation, which is incorporated and made a part hereof by reference.

☐ Continued on the attached sheet.

_____
*Complainant's signature*

MARC JONES, Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my presence.

Date: **May 13, 2022**

_____
*Judge's signature*

City and State: Oklahoma City, Oklahoma

  SHON T. ERWIN, U.S. Magistrate Judge  
*Printed name and title*

2

**WESTERN DISTRICT OF OKLAHOMA**
**OKLAHOMA CITY, OKLAHOMA**

STATE OF OKLAHOMA )
                                 )
COUNTY OF OKLAHOMA )

## AFFIDAVIT

I, Marc Jones, Special Agent with the Federal Bureau of Investigations (FBI), being duly sworn, depose and state as follows:

1.    I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and empowered by law to conduct investigations of, and to make arrests for offenses as set forth in 18 U.S.C. § 2516.

2.    I have been employed as a Special Agent with the FBI since April 2021. I am currently assigned to the Oklahoma City Division, where I have been involved in a wide variety of investigative matters, including investigations targeting large criminal enterprises, most of which involved the unlawful distribution of narcotics in violation of 21 U.S.C. §§ 841(a)(1) and 846. During the course of these investigations, I have been the affiant in multiple Title III wire intercept affidavits, coordinated the execution of search and arrest warrants, conducted physical surveillance, coordinated controlled purchases with confidential sources, analyzed records documenting the purchase and sale of illegal drugs, and spoken with informants and subjects,

as well as other local and federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs.   Through my training and experience, I have become familiar with some of the manners in which illegal drugs are imported, distributed, and sold, as well as the methods used by drug dealers to disguise the source and nature of their profits.

3.     The facts set forth in this Affidavit are based upon my personal knowledge, knowledge obtained from other law enforcement personnel, review of documents related to this investigation, communications with other individuals who have personal knowledge of the events and circumstances described herein, and information gained through training and experience. Since this Affidavit is being submitted for the limited purpose of seeking a complaint and arrest warrants against the individuals named below, I have not included every fact known to me concerning this investigation.   Rather I have set forth only the facts I believe are essential to establish the foundation necessary to support the complaint and arrest warrants.

## PURPOSE OF AFFIDAVIT

4.     I make this affidavit in support of a criminal complaint and arrest warrants for **VICTORIANO NERI HERNANDEZ (NERI); ANTONIO ORTIZ HERERRA (ORTIZ); SAMPSON EDGARDO CHAVEZ, a/k/a**

**"Osito" (CHAVEZ); CESAR CECILIO PEREZ RUBIO (RUBIO); JUAN CITLACIC DE LUNA, a/k/a "Poste" (DE LUNA); IVAN CHANAX AGUILAR (CHANAX); RUBY JACKSON (JACKSON);** and **(UM6086), a/k/a "Pelon"** for their participation in a drug conspiracy—that is a conspiracy to possess with intent to distribute and to distribute 500 grams or more of methamphetamine, a Schedule II controlled substance, and a conspiracy to possess with intent to distribute and to distribute 5 kilograms or more of cocaine, a Schedule II controlled substance, from in or about September 2021 and continuing thereafter until on or about May 12, 2022, in violation of 21 U.S.C. § 846.

## BACKGROUND TO INVESTIGATION

5.    The FBI and the Oklahoma City Police Department (OCPD) are currently conducting a joint investigation targeting a large-scale criminal enterprise, the NERI-ORTIZ Drug Trafficking Organization (DTO), involved in the importation, transportation, and distribution of controlled substances— specifically, cocaine and methamphetamine. Throughout this investigation, law enforcement has determined that this DTO imports large quantities of both methamphetamine and cocaine, both of which are transported into the United States via camper shells attached to the beds of pickup trucks. In turn, this DTO loads the cash, received from the proceeds of their drug sales, into

3

camper shells and transports the cash back to Mexico.

6.      Information developed during this investigation indicates that **NERI** runs the NERI-ORTIZ DTO from the Oklahoma City area, with the help of **ORTIZ** (second in command and also located in the Oklahoma City area). Both **NERI** and **ORTIZ** appear to be long-time residents of Oklahoma, and most of their drug business appears to take place in Oklahoma, North Carolina, Kentucky and Texas. Because **NERI** and **ORTIZ** reside in the Oklahoma City area, they have utilized other members of this DTO to assist with the transportation and distribution of cash and drugs within Oklahoma and throughout the country.

7.      **CHAVEZ** has been identified as a courier for this DTO who primarily resides in Texas. **RUBIO** has been identified as a local (i.e., Oklahoma City) member of the DTO that takes orders directly from both **ORTIZ** and **NERI** while also spending time living with **ORTIZ** at his primary residence, 2621 Shady Tree Lane, Edmond, Oklahoma (the "Shady Tree Residence"). **DE LUNA** has also been identified as a distributor for this DTO, taking orders directly from **ORTIZ**, and often times completing drug deals at **ORTIZ**'s request. **CHANAX** has been identified as a member of this DTO, taking order directly from **NERI**. **JACKSON** has also been identified as both a member of this DTO and a customer. She has accompanied **ORTIZ** on

4

multiple trips to Kentucky and North Carolina—primary distribution locations for this DTO—and has also been observed coordinating and receiving drugs from **ORTIZ**. **UM6086** has been identified as the primary point of contact in North Carolina for **ORTIZ**. During **ORTIZ** and **JACKSON**'s trips to North Carolina, they have traveled to the residence of **UM6086**.   During these trips, **ORTIZ**'s truck was equipped with a white camper shell. Law enforcement has observed this camper shell being removed at the residence of **UM6086** and then put back on before **ORTIZ** and **JACKSON** returned to Oklahoma.

### THE NERI-ORTIZ DTO'S USE OF CAMPER SHELLS TO TRANSPORT DRUGS AND DRUG PROCEEDS

8.     Law enforcement first discovered that this DTO utilized camper shells in September 2021. At that time, law enforcement observed Marco Antonio Flores Rodriguez (FLORES) arrive at **ORTIZ**'s then-residence in a truck equipped with a camper shell.   Law enforcement observed **ORTIZ** and FLORES remove the camper shell from FLORES's truck, place it in the garage, and then later place it back on FLORES's truck. Following that exchange, law enforcement conducted a traffic stop on FLORES's truck, which led to the discovery of $145,533, two cell phones, and evidence the vehicle had just delivered up to 49 kilograms of cocaine.[1]   A subsequent review of the cell

---

[1]     There was 49 square, kilogram-sized, outlines on the interior roof of the

5

phones showed that FLORES was acting at the direction of an individual in Mexico.  Since FLORES's arrest, the NERI-ORTIZ DTO has used different couriers, including **CHAVEZ**, to deliver the controlled substances to **ORTIZ** (receiving them on behalf of **NERI**), who then redistributes the substances throughout the United States, including Kentucky and North Carolina. This DTO has also utilized **CHAVEZ** to transport cash received from drug proceeds into Mexico.

9.    More evidence of the use of camper shells was obtained throughout March 2022. On March 4, 2022, surveillance showed **ORTIZ** and **JACKSON** departing **ORTIZ's** residence in **ORTIZ's** red Toyota Tundra (the "red Tundra"), which was equipped with a white camper shell.  According to the GPS tracker on the red Tundra and the ping on **ORTIZ's** phone,[2] **ORTIZ** and **JACKSON** then travelled to 11301 Ambers Court, Venus, Texas (the "Ambers Court Residence") before travelling to North Carolina and Kentucky.  A ping on the phone of a courier for the NERI-ORTIZ DTO (hereinafter, "Courier 1") showed Courier 1 at the Ambers Court residence on March 4, 2022, at the same

---

camper shell.

[2]    A court-authorized ping was first obtained on **ORTIZ's** phone on October 5, 2021, and has been continuously renewed throughout this investigation.   In addition, a court-authorized GPS tracker warrant was obtained for **ORTIZ's** red Toyota Tundra on October 8, 2021, and has been continuously renewed throughout this investigation.

time as **ORTIZ** and **JACKSON**.[3] From Texas, **ORTIZ** and **JACKSON**
travelled to North Carolina and Kentucky.

10.    While **ORTIZ** and **JACKSON** were in North Carolina, law
enforcement intercepted telephone calls between **ORTIZ**, who was using 405-
640-1746 (TT1),[4] and an individual later identified as J. NERI[5] at telephone
number 52-449-313-2614 (TT1 Ref. #42). During this phone call, J. NERI and
**ORTIZ** discussed when **ORTIZ** would be leaving and if **ORTIZ** had spoken
with "Pelon," i.e., **UM6086**. **ORTIZ** explained that "Pelon told me that maybe
it would be ready tomorrow or Sunday. Supposedly the baseball caps didn't
work out and he had to purchase another one." **ORTIZ** then added, "we will go
straight to the ranch and they will go with Osito." Based on my training and

---

[3]    Courier 1 was originally identified after law enforcement observed him
deliver drugs, via a truck with a camper shell, to **ORTIZ's** residence, on
February 6, 2022. The ping on Courier 1's phone was obtained on February 22,
2022.

[4]    On March 16, 2022, the Hon. Stephen Friot, U.S. District Judge for the
Western District of Oklahoma, signed an Order pursuant to 18 U.S.C. § 2518,
*et seq.* authorizing the interception of wire and electronic communications over
ORTIZ's telephone, (405) 640-1746 (TT1).   Then, on April 14, 2022, the Hon.
Stephen Friot, U.S. District Judge for the Western District of Oklahoma,
signed an Order pursuant to 18 U.S.C. § 2518, *et seq.* authorizing the
government to extend interception of wire and electronic communications over
TT1.

[5]    During the investigation described herein, law enforcement identified J.
NERI as NERI's brother and a high-ranking member of this DTO that resides
in Mexico.

experience, I believe **ORTIZ** was explaining to J. NERI the issues "Pelon" was having with the camper shell[6] **ORTIZ** had delivered to North Carolina. Further, I believe that because there were issues with the original camper shell, "Pelon" had to purchase a new camper shell, which had delayed **ORTIZ**'s return, but **ORTIZ** planned to return directly to the ranch, i.e., his residence.

11.     On March 19, 2022, while **ORTIZ** and **JACKSON** were still in North Carolina, law enforcement intercepted a phone call between **ORTIZ** and **UM6086** (i.e., "Pelon") at (252) 292-6086 (TT1 Ref. #56). **UM6086** stated "the men told me that due to the smell they want it to remain there so the smell dissipates." He added that he "needed to flip it and clean the top part with a rag." **ORTIZ** stated he "and the others will get ready tomorrow morning between 7:00 and 8:00. They will go as soon as they pick it up." Based on my training and experience, I believe that **UM6086** had finished loading drug proceeds into a camper shell, and **ORTIZ** was arranging with **UM6086** to pick up that camper shell, which **ORTIZ** would then transport back to Oklahoma before waiting on someone else to transport it back to Mexico. Based on my

---

[6]     During the conversation, **ORTIZ** referenced "baseball caps" which law enforcement believe was coded language for the camper shell. Law enforcement received verification when surveillance showed **ORTIZ** arriving back at his residence on March 21, 2022, with a brand-new camper shell on his Toyota Tundra.

training, experience, and knowledge of this investigation, I believe that **UM6086** was explaining to **ORTIZ** that the camper shell should be completed (i.e., resealed) in about a half an hour, but it needs to air out overnight to get rid of the smell. I also believe that **UM6086** was stating the camper shell had a chemical smell from his men resealing the interior roof of the camper shell, and that **ORTIZ** could pick up the camper shell the next morning once it had time to air out.

12.    **ORTIZ** and **JACKSON** returned to Oklahoma on March 21, 2022, in **ORTIZ**'s red Tundra, still equipped with a white camper shell. Based on my training, experience, and knowledge of the investigation, **ORTIZ** and **JACKSON** travelled to Kentucky and North Carolina, likely with cocaine and or methamphetamine in their camper shell, which they picked up from Courier 1 at the Amber Court Residence. They then delivered the drugs to **UM6086** and contacts in Kentucky before returning to Oklahoma with the cash proceeds from that drug exchange.

13.    On March 21, 2022, law enforcement observed **ORTIZ** meet with **CHAVEZ** at an automobile repair garage located at 10105 N Western Avenue, Oklahoma City, Oklahoma (the "Western Garage").   Prior to this meeting, law enforcement intercepted a phone call between **ORTIZ** and **CHAVEZ** (TT1 Ref. #94) in which **CHAVEZ** stated, "I was called a little while ago and was told to

9

head to your ranch." **ORTIZ** and **CHAVEZ** then agreed to meet at the Western Garage. **ORTIZ** stated that "it is better to do it there since they are going one and the other one," and "it is easier there because they have all the tools to do the mechanic work." After this call, law enforcement observed **ORTIZ** arrive at the meeting location driving his red Tundra, still equipped with a white camper shell, and **CHAVEZ** arrive driving a white Ford F-150, also equipped with a white camper shell. **ORTIZ** and **CHAVEZ** removed the camper shell from **ORTIZ**'s truck and placed it on **CHAVEZ**'s truck. They also took the camper shell off **CHAVEZ**'s truck and placed it on **ORTIZ**'s truck. Additionally, after they exchanged camper shells, **CHANAX** arrived and placed an item into **ORTIZ**'s truck. **CHAVEZ** then retrieved the item from **ORTIZ**'s truck and took it with him when he departed. On March 24, 2022, **CHAVEZ**'s truck crossed the border into Mexico. Following the meet, **ORTIZ** and **CHANAX** drove to **ORTIZ**'s residence and placed the camper shell from his truck into the garage. Based on my training, experience, and knowledge of the investigation, **ORTIZ** returned to Oklahoma City with money gained from drug exchanges in North Carolina and Kentucky. He then coordinated a meeting with **CHAVEZ** who took the camper shell, loaded with money, and transported it to Mexico, where the heads of the DTO reside.

14.    Further evidence of this DTO's use of camper shells was obtained

10

on April 13, 2022, when two couriers (Courier 2 and Courier 3) arrived at the Western Garage, the same Oklahoma City location where **ORTIZ** had swapped camper shells with **CHAVEZ**. Courier 2 was driving a Mexican model Ford "Lobo," bearing a Tijuana license plate. Shortly after Courier 2's arrival, **ORTIZ** arrived, driving his red Tundra, again equipped with a white camper shell. With the assistance of **DE LUNA**, **RUBIO**, and other unidentified individuals, **ORTIZ** and Courier 2 lifted the camper shell off Courier 2's truck and placed it on **ORTIZ** truck. They also lifted the camper shell off **ORTIZ**'s truck and placed it on Courier 2's truck. **ORTIZ** then took the camper shell to the Shady Tree Residence and placed it in the garage, with the assistance of **RUBIO**. Based on my training, experience, and knowledge of the investigation, I believe that Courier 2 travelled from Mexico, with drugs loaded in the camper shell attached to his truck. He then delivered those drugs to **ORTIZ**, who took them to his house and, with **RUBIO**'s help, unloaded them at the Shady Tree Residence.

15.     On April 15, 2022, two days after the delivery by Courier 2, a conversation between **NERI** and **ORTIZ** was intercepted via TT2 (TT2 Ref. #20). [7]    During the call, **NERI** states, "I was thinking anyway, look,

---

[7]     On April 14, 2022, the Hon. Stephen Friot, U.S. District Judge for the Western District of Oklahoma, signed an Order pursuant to 18 U.S.C. § 2518,

because . . . because the little cap that [stammers] they brought yesterday. I think it's only Fordcitas, cuz."   Later in the call, **NERI** tells **ORTIZ**, "Write everything down, my 'secre,' just like we said, uh?" **ORTIZ** responds, "No, I have everything written down."   **NERI** then states, "There you go, this way, you are keeping count. Look at this and this, so we can say what belongs to El Abuelo, what belongs over here and that's that."   Based on my training and experience, and knowledge of this investigation, I believe that **NERI** was using code words ("little cap" and "Fordcitas") to discuss drug trafficking with **ORTIZ**.   During this investigation, the NERI-ORTIZ DTO has frequently utilized car parts as code words for drugs.[8]   Further, based on the fact that a camper shell had been delivered to **ORTIZ** two days prior to this call, I believe **NERI** was talking about a camper shell (a "little cap") containing a small load of drugs ("Fordcitas") the Courier 2 and Courier 3 had just delivered to **ORTIZ**.

16.   On April 27, 2022, **ORTIZ** and **JACKSON** took a trip to North Carolina.   The two would also visit Kentucky before returning to Oklahoma City (after another stop in North Carolina) on May 8, 2022. When **ORTIZ** and

---

*et seq.* authorizing the government to intercept wire and electronic communications (405) 243-1864 (TT2).

[8]   CS1, discussed below, was told by **ORTIZ** to use code words, such as "two truck parts" for two ounces when conducting controlled drug purchases from **ORTIZ**.

JACKSON departed Oklahoma, **ORTIZ's** red Tundra was equipped with a white camper shell. On April 28, 2022, **ORTIZ** and **JACKSON** arrived at **UM6086's** residence in North Carolina. The camper shell was removed from **ORTIZ's** truck, and **ORTIZ** and **JACKSON** departed, still in the red Tundra. GPS and ping analysis show that **ORTIZ** (and presumably **JACKSON**) traveled to Kentucky before returning to North Carolina and spending a couple days near the ocean. Intercepts over TT2 (**ORTIZ**'s phone) revealed that **ORTIZ** spent time at the beach with **JACKSON** but intended to pick up the camper shell, loaded with money, from **UM6086** on May 6, 2022. This plan appears to have come to fruition.   On May 6, 2022, surveillance cameras showed **ORTIZ** and **JACKSON** again arriving at **UM6086's** residence in **ORTIZ's** red Tundra. A white camper shell was loaded onto **ORTIZ's** truck, and **ORTIZ** and **JACKSON** departed shortly thereafter.   That this trip had been drug related was only further corroborated by intercepts over TT2. **ORTIZ** and **NERI** were intercepted numerous times, with **ORTIZ** updating **NERI** on the status of his trip.   Based on my training, experience, and knowledge of the investigation, **ORTIZ** and **JACKSON** travelled to North Carolina and Kentucky in order to collect money owed to the NERI-ORTIZ DTO. It took the distributors in North Carolina a few days to load the cash into the camper shell with the cash and seal it before it was ready for **ORTIZ** and

**JACKSON** to transport back to Oklahoma.

17.     On April 26, 2022, a day prior to **ORTIZ** and **JACKSON**'s departure from Oklahoma, the court-authorized GPS tracker installed on **CHAVEZ**'s truck, showed **CHAVEZ** to be crossing into Mexico at the Eagle Pass border crossing, near Del Rio, Texas.[9] On May 3, 2022, calls intercepted between **ORTIZ** and **RUBIO** indicated that **RUBIO** would be traveling to Venus, Texas, to meet with **CHAVEZ**. On May 3, 2022, via surveillance cameras, law enforcement observed **RUBIO** and **CHAVEZ** meeting at the Ambers Court Residence in Venus, Texas.   **CHAVEZ** was driving his Ford F-150, again equipped with a camper shell. **CHAVEZ** and **RUBIO** removed the camper shell from **CHAVEZ's** truck and left it near the back of the property. Phone calls intercepted between **RUBIO** and **ORTIZ** indicated the camper shell delivered by **CHAVEZ** was loaded with 49 kilograms of cocaine. Additional phone calls intercepted over **ORTIZ**'s phone also indicated that an unidentified female from San Antonio brought an additional 10 kilograms to the Venus, Texas property. The following day, May 4, 2022, law enforcement observed **CHANAX** arrive at the Venus, Texas property and meet with **RUBIO**. Phone calls later intercepted indicate that **CHANAX**, acting on

---

9     The GPS tracker warrant for **CHAVEZ's** truck was issued on April 15, 2022, and installed on April 20, 2022.

orders from **NERI**, left the Venus property with seven kilograms of cocaine, which he transported to **ORTIZ**'s house in Edmond, Oklahoma.

18.     Subsequently, a search warrant was conducted at the Ambers Court Residence in Venus, Texas, on May 12, 2022. During the search of the property, law enforcement discovered approximately 40 individually wrapped packages, which, based on my training and experience, appeared to weigh between a pound and a kilogram. Additionally, law enforcement found a hollowed out camper shell on the property, which presumably is the camper shell that was used by **CHAVEZ** to deliver the cocaine on May 3, 2022.

19.     On May 7, 2022, **ORTIZ** and **JACKSON**, after leaving North Carolina, arrived at the Venus, Texas property, still driving **ORTIZ**'s red Tundra with a white camper shell. Shortly after **ORTIZ** and **JACKSON** arrived, **CHAVEZ** arrived (driving a truck without a camper shell attached). Approximately 25 minutes later, **CHAVEZ's** truck departed—equipped with a white camper shell.   **ORTIZ's** red Tundra also departed, and it was no longer equipped with a white camper shell.   Calls later intercepted over **ORTIZ's** phone indicate that the camper shell **ORTIZ** gave to **CHAVEZ** was loaded with approximately $600,000 that he had received from his trip to North Carolina and Kentucky. Based on my training, experience, and knowledge of the investigation, **ORTIZ** and **JACKSON** travelled to the Ambers Court

15

Residence in Venus, Texas, before returning to Oklahoma to check on the drug delivery that **CHAVEZ** had made and to give **CHAVEZ** the camper shell, loaded with $600,000, which **CHAVEZ** planned to transport to Mexico.

20.    Additionally, on May 12, 2022, a search warrant was executed on **CHAVEZ**'s truck, which was still equipped with a white camper shell. A search of the camper shell revealed a large quantity of cash arranged neatly within the roof of the camper shell. Due to the large quantity of cash, an exact amount is not known at this time. However, based on my training, experience, and knowledge of the investigation, it is likely that the camper shell had $600,000 as **ORTIZ** discussed with **RUBIO** over intercepted phone calls.

21.    All told, this organization appears to be responsible for the importation, transportation, and distribution of hundreds of kilograms of methamphetamine and cocaine per year in the Western District of Oklahoma and elsewhere, primarily through the use of camper shells.   With that, millions of dollars per year are obtained in drug proceeds, most of which is ultimately transferred back down to Mexico, primarily through bulk cash smuggling.   During this investigation, law enforcement has employed a number of investigative techniques, ranging from the use of cooperating sources, controlled buys, physical surveillance, consensually recorded telephone calls, and court-authorized wiretaps.   At every step, these

16

techniques have shown the existence of an extensive conspiracy to distribute large amounts of methamphetamine and cocaine across Oklahoma and other parts of the country.

## CONTROLLED PURCHASES AND ADDITIONAL DRUG SEIZURES

22.     During this investigation, law enforcement has developed two confidential sources (CS) who have been utilized to gain insight into this DTO, CS1[10] and CS2.[11] Law enforcement has used CS1 and CS2 to conduct five successful controlled drug purchases from **ORTIZ**: (i) a purchase of one ounce of cocaine from **ORTIZ** on November 27, 2021, by CS1; (ii) a purchase of two ounces of cocaine from **ORTIZ** on January 10, 2022, by CS1; (iii) a purchase of one pound of methamphetamine from **ORTIZ** on February 25, 2022, by CS2;

---

[10]     CS1 has furnished information to law enforcement voluntarily, and for that cooperation has received monetary compensation in the amount of approximately $500. The information provided by CS1 has been corroborated through other investigative techniques, including physical and electronic surveillance and consensually recorded conversations.   Information provided by CS1 has been reliable, and I am unaware of any knowingly false information furnished by CS1.   Information herein attributed to CS1, unless otherwise noted, was obtained by CS1 through his/her personal observations and/or conversations with target(s) of this investigation and their associates

[11]     The information provided by CS2 has been corroborated through other investigative techniques, including physical and electronic surveillance and consensually recorded conversations.   Information provided by CS2 has been reliable, and I am unaware of any knowingly false information furnished by CS2.   Information herein attributed to CS2, unless otherwise noted, was obtained by CS2 through his/her personal observations and/or conversations with target(s).

(iv) a purchase of one pound of methamphetamine from **ORTIZ** on March 31, 2022, by CS2; and (v) a purchase of one-quarter pound of cocaine from **ORTIZ** on April 22, 2022, by CS1.

23.     Throughout the course of the investigation, CS1 has been used to purchase cocaine from **ORTIZ** and CS2 has been used to purchase methamphetamine from **ORTIZ**.

24.     On April 29, 2022, an arrest took place following a drug exchange that was coordinated by **ORTIZ** and carried out on his behalf by **RUBIO** and **DE LUNA**. That day, **ORTIZ** was outside of Oklahoma, traveling between North Carolina and Kentucky with **JACKSON**. **RUBIO** was residing at **ORTIZ**'s residence. **RUBIO** was observed, via surveillance cameras, loading a black duffle bag into the back of a white truck that he was driving when he departed **ORTIZ**'s residence. **RUBIO** met **DE LUNA** at the Western Garage and gave the black duffle bag to **DE LUNA**. A short while later, a black Nissan Altima, occupied by two individuals later identified as David Gandara (GANDARA) and Jorge Luis Becerra (BECERRA) arrived at the Western Garage. Surveillance units observed **DE LUNA** approach the vehicle and place the black duffle bag in the back seat on the driver's side. The vehicle immediately departed the Western Garage and began to travel in the direction of Tulsa, Oklahoma, followed by surveillance units. Along the way, Oklahoma

18

Highway Patrol attempted to stop the vehicle, but GANDARA (the driver) fled and began a vehicle pursuit, at times going over approximately 120 miles per hour. The vehicle crashed and GANDARA fled on foot. BECERRA was detained at the site of the crash and GANDARA was later apprehended by law enforcement and arrested. Inside the black duffle bag, law enforcement discovered approximately 12 pounds of methamphetamine. Calls intercepted between **ORTIZ** and **NERI**; **ORTIZ** and Jorge Alejandro Neri Hernandez (J. NERI); and **ORTIZ** and **DE LUNA** were later intercepted in which the individuals were discussing this stop and arrest.

25.    Prior to these arrests, on April 26, 2022, at approximately 12:15 p.m. **ORTIZ** received an incoming call on TT2 (TT2 Ref. # 449) from **NERI**, who was using TT3.[12]   During the call, **NERI** asks "how the beans turned out." **ORTIZ** responds, "bad ass."   **ORTIZ** then tells **NERI** that **ORTIZ** already told "him" that he was going to go "over there."   **NERI** replies that he already talked to "him" and told him to go if he wanted.   **NERI** continues, explaining that "El Abuelo" can really get after them.   **NERI** also states that "El Abuelo" sometimes does not say anything to them but will all of a sudden want them

---

[12]    On May 5, 2022, the Hon. Stephen Friot, U.S. District Judge for the Western District of Oklahoma, signed an Order pursuant to 18 U.S.C. § 2518, *et seq.* authorizing the government to intercept wire and electronic communications (580) 649-7852 (TT3).

19

to take off right away.   **ORTIZ** says he spoke to "him," who said they were going to go yesterday, but they had just woken up and had no way to get around.     Based on my training, experience, and knowledge of the investigation, I believe that during this conversation, **ORTIZ** and **NERI** are discussing how the methamphetamine ("the beans") turned out.   Investigators have identified "beans" as a code word commonly used by this DTO to refer to methamphetamine.

26.    On April 27, 2022, at approximately 11:56 p.m., **ORTIZ** sent an outgoing text message (TT2 Ref. #548) to **DE LUNA**, who was using (405) 204-4304, that read, "What are you doing[.]" **DE LUNA** then responded at 11:57 p.m., saying, "Here too just about to turn on the pot for the beans" (TT2 Ref. #550).   **ORTIZ** then responded (TT2 Ref. #552) at 11:57 p.m., "All right." Based on my training, experience, and knowledge of the investigation, I believe that **DE LUNA** was referring to cooking methamphetamine, i.e., converting it to crystal form, when he stated that he was about to "turn on the pot for the beans."   In fact, **ORTIZ** has previously explained to CS1 that the organization receives methamphetamine in both liquid and powder form—both of which would require individuals to convert the methamphetamine into the crystal form that it is commonly sold in. This conversion process is often referred to as "cooking", and commonly involves a heat source applied to a cooking pot, which

20

is what I believe **DE LUNA** was referencing here.

27.    A search warrant was executed at the Shady Tree Residence (i.e., **ORTIZ**'s residence) on May 12, 2022. During this search warrant law enforcement discovered approximately 10 individually wrapped packages of what appeared to be cocaine, a five-gallon bucket filled approximately halfway with what appeared to be methamphetamine, additional methamphetamine that was spread out on a plastic tarp, along with drug paraphernalia, including scales and plastic bags located next to the drugs. Law enforcement does not have exact weights for the drugs due to the large quantity that was obtained during the search warrant.

## CONCLUSION

28.    Based on my training and experience, and the foregoing information, I submit that there is probable cause to believe that **VICTORIANO NERI HERNANDEZ (NERI)**; **ANTONIO ORTIZ HERERRA (ORTIZ)**; **SAMPSON EDGARDO CHAVEZ, a/k/a "Osito" (CHAVEZ)**; **CESAR CECILIO PEREZ RUBIO (RUBIO)**; **JUAN CITLACIC DE LUNA, a/k/a "Poste" (DE LUNA)**; **IVAN CHANAX GARCIA (CHANAX)**; **RUBY JACKSON (JACKSON)**; and **(UM6086), a/k/a "Pelon,"** knowingly and intentionally conspired together, along with other persons both known and unknown, to possess with intent to distribute and to

21

distribute 500 grams or more of methamphetamine and 5 or more kilograms of cocaine, both   Schedule II controlled substances, in violation of 21 U.S.C. § 846.   It is therefore requested that arrest warrants be issued for the offense listed above.

MARC JONES
Special Agent
Federal Bureau of Investigation

Sworn to before me this _13th_ day of May, 2022.

SHON T. ERWIN
United States Magistrate Judge
Western District of Oklahoma

22